## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| ELIZABETH MCELROY, as Administrator of the Estate of Parish Laconley Powell, deceased, | )<br>)<br>) |
| Plaintiffs, | )<br>) Case Number: 2:15-cv-00120-JHE |
| v. | )<br>) |
| OFFICER GABRIEL KINDERKNECHT, | )<br>) |
| Defendant. | ) |

## MEMORANDUM OPINION[1]

Plaintiffs Elizabeth McElroy[2] and Mamie Powell initiated this action in the Circuit Court of Jefferson County, Alabama, Bessemer Division, against Defendants City of Bessemer, Alabama and Officer Gabriel Kinderknecht. (Doc. 1-1). In their First Amended Complaint, Plaintiffs assert a 42 U.S.C. § 1983 claim for excessive force and state law claims for wrongful death and intentional infliction of emotional distress. (*Id.*). Defendants removed the action to this Court and moved to dismiss the First Amended Complaint. (Docs. 1-1 & 5). On April 13, 2015, the undersigned entered a memorandum opinion granting the motion to dismiss as to Plaintiffs' § 1983 claim against the City of Bessemer only, wrongful death claim, and intentional infliction of emotional distress claim. (Doc. 18). The sole remaining claim is Plaintiff's § 1983 excessive force against Officer Kinderknect. (*Id.*). Officer Kinderknecht has now moved for summary judgment. (Doc. 28). The motion is fully briefed and ripe for review. (Docs. 29, 31, 36). For the reasons stated below, the motion for

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment.

[2] Plaintiff Elizabeth McElroy proceeds as the administrator of the Estate of Parish Laconley Powell, deceased. (Doc. 1-1 at 72).

1

summary judgment is **GRANTED.**

## I.     Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper if the pleadings, the discovery, and disclosure materials on file, and any affidavits "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." "Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 447 U.S. 317, 322 (1986).  The moving party bears the initial burden of proving the absence of a genuine issue of material fact.  *Id.* at 323.  The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish there is a "genuine issue for trial." *Id.* at 324.  (citation and internal quotation marks omitted).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor).  Any factual disputes will be resolved in Plaintiff's favor when sufficient competent evidence supports Plaintiff's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276-78 (11th Cir. 2002) (a Court is not required to resolve disputes in the non-moving party's favor when that party's version of the events is supported by insufficient evidence).  However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam)

(citing *Bald Mtn. Park, Ltd. V. Oliver*, 836 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II.     Summary Judgment Facts[3]

On May 17, 2012, at approximately 1:30 a.m., emergency dispatchers received a call from Mamie Powell, who was with her sons Parish, Timothy, and Walter in Bessemer, Alabama. (Doc. 29-1 at 29 (111:4-9); doc. 29-2; *see* doc. 29-4 at ¶3). Mamie Powell "told them that she needed someone to come and take [Parish Powell] to the emergency room because his blood pressure was up." (Doc. 29-1 at 29 (111:4-9)). Dispatch records indicate the call occurred at approximately 1:34 a.m., and they show that dispatch was informed that Parish Powell had an "altered mental status," was a "[d]iabetic," and had "[h]igh blood pressure." (Doc. 29-2). Mamie Powell testified that, earlier that day, Parish Powell told her he had a vision or premonition that police officers were going to "get her," and that he had "seen it, like something you see in a daydream or night dream."[4] (Doc. 29-3 at 15 (54:7-55:10)).

Upon receiving the call. Bessemer Fire Department Engine No. 2 (which included Lt.

---

[3] All citations to the record reference document and page numbers as assigned by the Court's electronic filing system (CM-ECF), except for citations to depositions, which refer to both the CM-ECF page number and the deposition page (and often line numbers). Internal page numbers have been disregarded with the exception of page numbers for deposition transcripts.

[4] On May 13, 2012 Bessemer Fire and Police were dispatched to the same house in response to a fight between Parish Powell and Timothy Powell. (Doc. 29-1 at 17(63:5- 64:19)). According to Timothy Powell, he was cutting a board and Parish Powell demanded he stop. (*Id.* (63:13-64:7)). The verbal confrontation escalated quickly into a physical fight, (*id.* at 20 (74:16-23)), and Parish Powell "had [Timothy Powell] on the ground." (*Id.* at 17 (64:15-19)). Timothy Powell struck Parish Powell in the face with his elbow. (*Id.*). Timothy Powell could not recall what he said – if anything – to provoke Parish Powell. (*Id.* at 20 at (75:6-76:1)). Parish Powell went to the hospital as a result of that fight, (*id.* at 18 (67:2-5)), and Timothy Powell was arrested and charged with domestic violence. (*Id.* (67:17-68:9)). The charges were later dropped. (*Id.*).

Rodney Lewis, Firefighter Tavares Pettus, Firefighter Russell Bell, Firefighter Richard Armstrong, and Firefighter Daniel Sanford) as well as Bessemer Police Officers Daniel Partridge and Brent Miller, were dispatched to the house. (Doc. 29-4 at ¶3; doc. 29-5 at 10 (33:13-15)); doc. 29-6 at 17 (63:17-22); doc. 29-7 at ¶5). Engine No. 2 was commanded by Lt. Rodney Lewis, who had been dispatched to the same location a few days earlier and rendered medical treatment to Parish Powell for the injuries he sustained as a result of the domestic violence episode with Timothy Powell. (Doc. 29-4 at ¶3; *see* fn. 4 *supra*). The firefighters and police officers arrived at the same time and entered the house together. (Doc. 29-4 at ¶3). Parish Powell was standing in the living room when the officers and firefighters arrived, but walked into a bedroom and stated that firefighters would have to treat him there. (*Id.* at ¶4). Parish Powell sat down and began to eat a bowl of ice cream as he watched television. (*Id.* at ¶5).

The firefighters then attempted to treat Parish Powell and take his vital signs, including his blood pressure. (*Id.* at ¶¶6-7; doc. 29-7 at ¶5). By this point, Officer Gabriel Kinderknecht and Officer Robert Hancock had also arrived on the scene. (Doc. 29-6 at 9 (32:6-32)). Emergency dispatch informed all responding units, including Officer Kinderknecht and Officer Hancock, that Parish Powell had an "altered mental status and that he had been physical with his family." (*Id.*).

Upon entering the residence, Officer Kinderknecht observed the firefighters attempting to treat Parish Powell. (Doc. 29-6 at 10 (34:5-12)). Parish Powell would not cooperate, and suddenly ripped off a blood pressure cuff and stood up. (Doc. 29-4 at ¶¶6-7; doc. 29-7 at ¶5). The firefighters tried to convince Parish Powell to let them treat him, but he did not respond. (Doc. 29-7 at ¶6). Instead, Parish Powell stated he needed to go to the bathroom and walked out of the bedroom. (Doc. 29-6 at 10 (36:1-12)). Rather than going to the bathroom, Parish Powell turned and walked into the kitchen. (*Id.*; doc. 29-7 at ¶7).

After entering the kitchen, Parish Powell immediately walked over to the kitchen sink, put down a bowl he had been holding, and opened up a drawer beside the sink and began pulling out knives. (Doc. 29-6 at 12 (42:10-23); doc. 29-5 at 12 (40:2-11); doc. 32 at ln. 5-8). Officer Kinderknecht, who was standing in the doorway of the kitchen approximately seven or eight feet away from Parish Powell, took his gun from its holster and asked Parish Powell what he was doing with the knives. (Doc. 29-6 at 11 (37:1-8); doc. 32 at ln. 12). By this point, Parish Powell had multiple knives in both hands. (Doc. 29-6 at 11 (39:23-27); doc. 29-5 at 12 (40:2-5)). No other officer pulled out his service pistol. (Doc. 29-6 at 12 (43:1-7)).

The firefighters in the house overheard the officers instructing Parish Powell to drop the knives, and they packed up their gear and exited the house because they felt the situation was becoming dangerous. (Doc. 29-4 at ¶¶7-8; doc. 29-7 at ¶¶7-8). Timothy Powell exited the house with the firefighters. (Doc. 29-1 at 33 (126:23-127:8)). Walter and Mamie Powell stayed inside. (Doc. 29-10 at 16 (60:23-61:15); doc. 29-3 at 14 (17-21)).

Officer Kinderknecht repeatedly instructed Parish Powell to put the knives down. Powell refused, stating "I'm not doing anything." (Doc. 29-6 at 47:10-18); doc. 29-7 at ¶7). During the confrontation Parish Powell demanded the police officers leave, and Officer Kinderknecht explained he could not do so because Parish Powell was armed and agitated. (doc. 29-6 at 11 (39:18-40:6)). Accordingly, not only did the officers believe it dangerous for them to back out of the kitchen, but Officer Kinderknect and Officer Miller testified they also had a duty to stay on scene and protect the other occupants of the house. (*Id.* at 15 (53:20-54:21); doc. 29-5 at 14 (48:12-23)).

As Officer Kinderknecht continued to attempt to convince Parish Powell to drop the knives, Parish Powell began yelling at the officers, telling them to "get the fuck out of my house." (Doc.

29-6 at 13 (47:10-20)). Officer Kinderknecht again explained to Parish Powell that he needed to put the knives down and allow the firefighters to treat him. (*Id.* at 15-16 (53:20-54:7, 59:17-60:13)). By this point, Officer Miller, who was standing in a second doorway to the kitchen immediately to Officer Kinderknect's right, had pulled out his pepper spray. (Doc. 29-6 at 12 (43:1-7); doc. 29-5 at 14 (47:1-23)). Upon seeing Officer Miller pull out his pepper spray, Parish Powell stepped back deeper into the kitchen and opened the freezer door, which blocked his face and would render Officer Miller's pepper spray ineffective if used. (Doc. 29-6 at 13, 15, 20 (47:22-48:2, 53:1-7, 75:7-11; doc. 29-5 at 14-15 (47:22-48:2, 49:21-50:3); doc. 29-9 at ¶5; doc. 29-8 at ¶19).

Parish Powell, who was holding multiple knives, then changed his grip on the knife in one of his hands to hold it by the blade in a throwing position. (Doc. 29-6 at 13 (46:18-22)). The knife he was holding in a throwing position was a serrated steak knife with a pointed tip. (*Id.* at 25 (93:3-15): doc. 29-8 (photograph)). Officer Kinderknect continued to instruct Parish Powell to drop of the knives and let the firefighters treat him. (*Id.* at 13-14 (48:12-49:11)). Officer Kinderknect also expressly warned Parish Powell that he would shoot him if he threw the knife. (Doc. 29-8 at ¶12). Officer Kinderknect discussed with Officer Miller his course of action, and both officers agreed that if Parish Powell threw the knife, Officer Kinderknecht would fire. (Doc. 29-6 at 22 (78:3-12)).

By this point, other police officers had also been dispatched to the scene to assist. (Doc. 29-9 at ¶3). Sergeant Jacqueline Pearson arrive at the residence and took Officer Miller's position in the second kitchen doorway, which was to Officer Kinderknecht's immediate right. (*Id.* at ¶4). Parish Powell, still with multiple knives including one in the throwing position, then demanded Officer Kinderknecht put his gun away. (Doc. 29-6 at 20-21 (76:19-77:23)). Officer

6

Kinderknecht, in an effort to deescalate the situation and calm Parish Powell, lowered his pistol and then directed Parish Powell to reciprocate by putting the knives in the sink. (*Id.*).

After Officer Kinderknecht lowered his weapon, Parish Powell quickly raised his arm, lunged toward Officer Kinderknecht, and started to come forward with the steak knife to throw it. (*Id.* at 21, 25 (77:15-23, 95:16-96:8)); *see also* doc. 29-9 at ¶8). The knife flew past Officer Kinderknecht as he fired three shots in rapid succession. (Doc. 29-6 at 23-25 (88:9-89:7, 96:6-8)). Officer Kinderknecht testified he tried to convince Parish Powell to drop the knives for approximately ten minutes before Powell threw a knife at him. (*Id.* at 19 (69:3-21)). Walter Powell testified the police officers were talking with Parish Powell for "ten or fifteen minutes" in the kitchen before he heard Officer Kinderknecht's shots. (Doc. 29-10 at 16 (60:17-22)). Timothy Powell testified similarly. (Doc. 29-1 at 35 (135:14-136:5)).

According to Defendant's Responses to Plaintiff's First Interrogatories, Officer Kinderknecht:

> All of the sudden, Mr. Powell raised his right hand with the steak knife by the blade to throw it. When the knife came up and Mr. Powell started to throw it, I fired the first shot. I saw the first shot impact Mr. Powell. He was still standing and still had the large kitchen knife so I fired an additional two shots in rapid succession. Mr. Powell fell to the ground. I do not remember if Mr. Powell completed the throw of the knife, but I have since seen photographs of the scene that confirmed he threw the knife at me.

(Doc. 31-2 at 8).

After he was shot, Parish Powell fell to the floor and the officers rushed into the kitchen. The officers kicked the remaining knives away from Parish Powell and immediately called the firefighters to come in and begin rendering medical aid. (Doc. 29-9 at ¶9; doc. 20-4 at ¶10; doc. 29-7 at ¶10). Parish Powell died in the ambulance in route to the hospital.

Timothy Powell, Walter Powell, and Mamie Powell did not see the confrontation in the

7

kitchen between the officers and Parish Powell. (Doc. 29-3 at 14, 15, 17, 18 (52:8-11, 55:11-15, 61:11-16, 62:4-8, 68:10-13); doc. 29-10 at 17, 22 (62:4-23, 64:14-21, 83:5-13); doc. 29-1 at 35, 36, 42, 46 (134:2-20, 137:21-138:15, 164:10-18, 177:8-15)). Timothy Powell did not hear any of the words exchanged between Parish Powell and the police officers while they were in the kitchen. (Doc. 29-1 at 46 (177:8-15)). Mamie Powell also testified she did not hear what Officer Kinderknecht said to Parish Powell. (Doc. 29-3 at 15, 17 (56:13-15, 62:4-8)). Walter Powell could not recall what the officers in the kitchen were saying Parish Powell. (Doc. 29-10 at 16 (60:6-11)).

The Jefferson County Sheriff's Department conducted an investigation into the shooting death of Parish Powell. That investigation was forwarded to Chief Assistant District Attorney William G. Vietch, who concluded that "there is no evidence to suggest that [Officer Kinderknecht] acted in any way, or under any motivation, or intent other that of <u>Self-Defense</u> of himself and others. It is the conclusion of this office that the shooting was <u>JUSTIFIED</u> under the circumstances." (Doc. 29-11).

### III. Analysis

The doctrine of qualified immunity "insulates government officials from personal liability for money damages for actions taken in good faith pursuant to their discretionary authority." *Greason v. Kemp*, 891 F.2d 829, 833 (11th Cir. 1990) (citing *Horlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "The purpose of this immunity is to allow government officials to carry out their discretionary duties without fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating federal law." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal citation and quotation marks omitted). The basic premise of the doctrine is for immunity to harbor government officials from liability unless their

conduct violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818.

A three-part analysis determines whether a government agent is eligible for qualified immunity. *See Vinyard v. Wilson*, 311 F.3d 1340, 1346-47 (11th Cir. 2002). First, the government official must show that he was engaged in a "discretionary function" when he committed the allegedly unlawful act. *Holloman v. Harland*, 370 F.3d 1252, 1263-64 (11th Cir. 2004). Once this burden is met, it "shifts to the plaintiff to show that qualified immunity is not appropriate." *Lee*, 284 F.3d at 1194 (citation omitted). To avoid the application of qualified immunity, the plaintiff must satisfy the two-prong test articulated by the Supreme Court in *Saucier v. Katz*, 533 U.S. 194 (2001), showing: (1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the violation, *id.*at 201. The Supreme Court has since explained that "judges of the district courts and courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, -- U.S. --, 129 S. Ct. 808, 181 (2009).

For purposes of evaluating qualified immunity, the parties do not dispute that Officer Kinderknecht was engaged in a discretionary function when the alleged unlawful act was committed. (Doc. 28 at 14; doc. 31-1). Officer Kinderknecht was responding to the 911 call and providing back-up while medical personnel attended to Parish Powell's medical condition, tasks undertaken pursuant to the performance of his duties and within the scope of his authority. *See Jordan v. Doe*, 38 F.3d 1559, 1566 (11th Cir. 1994). Therefore, the burden shifts to the plaintiff to plead facts *and* offer evidence demonstrating Officer Kinderknecht violated a constitutional right that was clearly established to strip him of qualified immunity. *See Saucier*, 533 U.S. at 201; *Maldonado v. Snead*, 168 Fed. Appx. 373, 378 (11th Cir. 2006). Nevertheless, at this stage in the proceedings, the court views the facts in the light most favorable to the plaintiff. *Id.*

### A. Officer Kinderknecht's Use of Force Was Not Unreasonable

The court first examines whether Officer Kinderknecht violated the Fourth Amendment. "Because the Fourth Amendment protects citizens from 'unreasonable' seizures, the use of deadly force must be reasonable under the circumstances." *Vaughn v. Cox*, 343 F.3d 1323, 1329 (11th Cir. 2003)). The Eleventh Circuit describes this analysis as follows:

> To determine if the use of force exceeded that which is necessary, courts are required to balance carefully "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985) (internal quotation marks omitted)).
>
> Any use of force must be reasonable. *Id.* at 395. Reasonableness is dependent on all the circumstances that are relevant to the officer's decision to use deadly force, including the seriousness of the crime, whether the suspect poses an immediate danger to the officer or others, whether the suspect resisted or attempted to evade arrest, and the feasibility of providing a warning before employing deadly force. *Penley*, 605 F.3d at 850. Perspective also is crucial to the analysis: "[t]he only perspective that counts is that of a reasonable officer on the scene at the time the events unfolded." *Garczynski v. Bradshaw*, 573 F.3d 1158, 1166 (11th Cir. 2009); *see also Graham*, 490 U.S. at 396 (explaining that a "standard of reasonableness at the moment applies").

*Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820-21 (11th Cir. 2010) (internal citations and quotations edited). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 396-97 (1989).

Plaintiff argues there are genuine issues of material fact that preclude summary judgment. Specifically, the plaintiff argues there are questions of fact as to whether the force Officer Kinderknecht used was reasonable, contending there is conflicting evidence regarding whether and/or when Parish Powell threw the knife at Officer Kinderknecht, calling Officer Kinderknect's credibility into question. (Doc. 31 at 5-6).

10

Officer Kinderknecht's interrogatory responses states as follows:

> All of the sudden, [Parish] Powell raised his right hand with the steak knife by the blade to throw it. When the knife came up and [Parish] Powell started to throw it, I fired the first shot. I saw the first shot impact [Parish] Powell. He was still standing and still had the large kitchen knife so I fired an additional two shots in rapid succession. [Parish] Powell fell to the ground. I do not remember if [Parish] Powell completed the throw of the knife, but I have since seen photographs of the scene that confirmed he threw the knife at me.

(Doc. 31-2 at 8).

In his deposition, Officer Kinderknecht testified as follows:

> Q: Did you believe he was trying to hit you with a knife?
> A: Yes. When he threw it, I believe he threw it with the intent to hit me.
> Q: So when you shot him, he had threw [sic] a knife at you?
> A: He was in the process of throwing the knife at me.
> Q: So he never actually threw the knife at you?
> A: He did throw the knife at me.
> . . .
> Q: Did the knife, did it make it – did the knife go past you?
> A: Yes, the knife did go past me.

(Doc. 29-6 at 25 (95:16-96:8)).

Finally, in his affidavit, Officer Kinderknecht testified that "I did not fire my weapon until I saw [Parish] Powell raise his arm and throw the serrated steak knife at me. At the time [Parish] Powell threw the knife, he was then [sic] 10 feet away from me." (Doc. 29-8 at ¶13.

Officer Kinderknecht's deposition and affidavit testimony are entirely consistent with his interrogatory answer. In the interrogatory response, Officer Kinderknecht explained that although he did not have a specific memory of Parish Powell completing the throw, he had since seen documentary, photographic evidence confirming that Parish Powell had thrown the knife. When he was deposed and when he signed his affidavit, Officer Kinderknecht testified based on his memory of the events and of seeing the photographs. There is nothing inconsistent about this evidence. Furthermore, there is additional evidence that confirms Parish Powell threw a knife at

11

Officer Kinderknecht.  Lt. Jacqueline testified "[w]ithout warning, [Parish] Powell suddenly stepped towards Officer Kinderknecht and me, raised the knife in his right hand, and threw it at Officer Kinderknecht.  I ducked back out of the door as Officer Kinderknecht fired three (3) shots in rapid succession."  (Doc. 29-9 at ¶8).  Detective Miller testified that immediately after the knife flashed through the air across his line of sight, he observed Officer Kinderknecht fire three shots in rapid succession.  (Doc. 29-5 at 15 (50:4-51:4)).  Plaintiff offers no evidence to dispute this testimony.

Much of Plaintiff's argument as to the unreasonableness of Officer Kinderknect's use of force is based on the premise that Officer Kinderknecht shot Parish Powell *before* any assault occurred.  (Doc. 31-1 at 8).  There is simply no evidence to support that theory.  The undisputed evidence establishes that Parish Powell had *at least begun* assaulting Officer Kinderknect with a deadly weapon,[5] where he was "pos[ing] an immediate danger to the officer [and] others," refusing to comply with officers' repeated instructions to drop the knives, and was "provid[ed] a warning before employing deadly force."  *Jean-Baptiste*, 627 F.3d at 820-21.

Plaintiff also appears to argue there was no immediate threat because Officer Kinderknecht was the only officer with a service pistol displayed on the scene and the only one who discharged a weapon.  (Doc. 31-1 at 9).  Plaintiff continues by arguing Parish Powell was not gravely dangerous because there was no clear pathway between Parish Powell and the officers, pointing out that Officer Miller, who had his pepper spray out, would have used his pepper spray to subdue Parish Powell if he could have, but could not because he was behind the freezer door.  (*Id.*).

---

[5] Alabama Code § 13A-1-2 (7) defines "deadly weapon" as "anything manifestly designed, made, or adapted for the purpose of inflicting death or serious physical injury."  A steak knife, although not specifically designed for the purpose of inflicting death or serious physical injury, is clearly capable of inflicting such injury if adapted for that purpose.  *See Cook v. Alabama*, 582 So. 2d 592, 593 (Ala. Crim. App. 1991).

Plaintiff is correct, It is undisputed that Officer Kinderknect was the only officer with a firearm pulled and that Parish Powell had opened the freezer door in front of his face. However, neither of these facts render Officer Kinderknect's actions unreasonable.

The objective reasonable standard does not require officers to use the best available means to stop or subdue an individual or to make the choice that, after the fact, outsiders deem more appropriate. *See Long v. Stanton*, 508, F3d 576, 583 (11th Cir. 2007). Officer Kinderknect was required to make split-second judgments in circumstances that were tense, uncertain, and rapidly evolving. The undisputed facts establish that Parish Powell was armed with multiple knives; he was within ten feet of Officer Kinderknect throughout the confrontation, which occurred in a small kitchen; Officer Kinderknect repeatedly asked Parish Powell to drop the knives, which Parish Powell refused to do; during the confrontation Parish Powell changed his grip on a serrated steak knife to hold it by the blade in a throwing position; after seeing Parish Powell change his grip on the serrated steak knife, Officer Kinderknect expressly warned Parish Powell that he would shoot if Powell threw the knife; and despite the warning, Parish Powell lunged and raised his arm to throw the knife – at which point Office Kinderknect fired three shots in rapid succession.

"[T]he law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act and stop the suspect." *Long v. Slaton*, 508 F.3d 576, 581 (11th Cir. 2007). It is undisputed Officer Kinderknect was confronted with what he perceived to be an imminent threat of serious bodily harm. "Irrespective of any errors that contributed to the circumstances," Officer Kinderknect was entitled to defend himself, unless his perspective can be shown to be unreasonable. *See Chappell v. City of Cleveland*, 585 F.3d 901, 915-16 (6th Cir. 2009); *see also Wood v. City of Lakeland, Fla*.., 203 F.3d 1288, 1292-93 (11th Cir. 2000) (reversing the denial of qualified immunity in a case where the officer used deadly force

13

against an individual in a "volatile, emotional, and aggressive state" who was armed with a box cutter and slid toward the officer with his momentum forward") *abrogated on other grounds by Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *Bullard v. City of Mobile, Ala.*, Civ. A 00-0114-CB-M, 2000 WL 33156407, at *6 (S.D. Ala. Dec. 14, 2000) (finding the officer's actions not unreasonable when the officer used deadly force against an aggressive individual with a knife who was starting to come towards him from eight to ten feet away). Based on these facts, the undersigned cannot conclude that Officer Kinderknect's use of force was objectively unreasonable.

### B. There is No Violation of Clearly Established Law

Notwithstanding the foregoing, even if Officer Kinderknect's use of deadly force was unreasonable and violated the Fourth Amendment, Plaintiff cannot show the violation of a right that was "clearly established," and Officer Kinderknect is entitled to qualified immunity and summary judgment on the plaintiff's claims.

> There are three ways in which [a plaintiff] may show that the right violated was clearly established: "(1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1291-92 (11th Cir. 2009) (citations omitted). The "salient question" is whether the state of the law at the time of the incident gave [the officer] "fair warning" that his conduct was unlawful. *See Hope v. Pelzer*, 536 U.S. 730, 741 . . . (2002).

*Perez v. Suszczynski*, 809 F.3d 1213 (11th Cir. 2016).

Plaintiff offers one case, *Mercado v. City of Orlando*, 407 F.3d 1152 (11th Cir. 2005), as being "materially similar" and putting Officer Kinderknecht on notice that his actions violated clearly established law. (Doc. 31-1 at 11-12). In *Mercado*,

> [O]fficers found Mercado sitting on the kitchen floor, crying. He was holding the knife in both hands and pointing it toward his heart. The telephone cord was still

14

> wrapped around his neck, but there is no evidence that it was still wrapped around the ceiling vent. The officers identified themselves and ordered Mercado to drop his knife at least two times (once in English and once in Spanish), but he refused without making any threatening moves toward the officers. At no time did the officers warn Mercado that force would be used if he did not drop his weapon.

*Id.* at 1154. Approximately fifteen to thirty seconds after seeing Mercado, and without any warning, the defendant officer shot Mercado in the head from a distance of approximately six feet with a Sage Launcher, which the officer knew could be lethal from close range. *Id.* at 1158. Mercado suffered a fractured skull and brain injuries from impact. *Id.* at 1154.

Unlike Mercado, Parish Powell was standing up, armed with multiple knives, including one in a throwing position, acting erratically, and cursing at officers. Unlike the defendant officer in *Mercado*, Officer Kinderknecht attempted to convince Parish Powell to drop the knives he was holding for ten to fifteen minutes and expressly warned Parish Powell that he would shoot if Parish Powell threw the knife. Notably, unlike Mercado, Parish Powell posed a lethal threat to officers on the scene and had made threatening moves, raising his arms, lunching, and throwing a knife at Officer Kinderknecht from within ten feet. The facts in *Mercado* are sufficiently distinguishable from those in this case that is it not clearly established law for the purpose of putting Officer Kinderknect on notice that he would be violating the law by using deadly force.

Plaintiff also argues that Officer Kinderknecht's "conduct was so egregious that a constitutional right was clearly violated, even in the total absence of case law." (Doc. 31-1 at 12-13). "To come within the narrow exception, a plaintiff must show that the official's conduct 'was so far beyond the hazy border between excessive and acceptable force that [the officer] had to know he was violating the Constitution even without caselaw on point.'" *Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 926 (11th Cir. 2000) (citation omitted). "This test entails determining whether 'application of the [excessive force] standard would inevitably lead every reasonable

officer in [the defendant's] position to conclude the force was unlawful.'" *Id.* (citing *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559 (11th Cir. 1993), *as amended*, 14 F.3d 583 (11th Cir. 1994)). "This standard, which offers a narrow exception to the general rule that only case law and specific factual scenarios can clearly establish a constitutional violation . . . is a difficult one to meet." *Bussey-Morice v. Gomez*, 587 F. Appx 621, 627-28 (11th Cir. 2014) (citations omitted). Conduct falling into this category includes fatally shooting an unarmed compliant suspect that was lying on the ground with his hands behind his back, *id.*, or slamming a suspect's head against the trunk after she was arrested, handcuffed, and completely secured – after any danger to the arresting officer as well as any risk of flight had passed. *Ferraro*, 284 F.3d 1199. The conduct at issue in this case does not come close to these types of situations. Again, Plaintiff's argument to the contrary relies on the unsupported statements that "there was no immediate threat of [Parish] Powell being able to strike any of the officers" and that Parish "Powell was not posing an immediate threat." (Doc. 31-1 at 12-13). There are simply no facts to support these statements. The undisputed evidence establishes that there was, at minimum, an escalating situation with a noncompliant subject wielding a serrated steak knife in a throwing position, who had access to other knives, and who lunged toward the officer as if to throw the serrated steak knife. This situation does not meet this standard.

### IV. Conclusion

There being no genuine issue of material fact, Officer Kinderknect is entitled qualified immunity and to summary judgment on Plaintiff's excessive force claim.

A separate order will be entered.

DONE this 20th day of March, 2017.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE